DAVID C. MARCUS (SBN 158704)
david.marcus@wilmerhale.com
CHRISTOPHER T. CASAMASSIMA (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5312
Facsimile: (213) 443-5400

*Attorneys for the Special Litigation Committee of the Board of Directors of MRV Communications, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| In re MRV COMMUNICATIONS, INC. DERIVATIVE LITIGATION | Master File No. 1:08-cv-03800-GAF (MANx) |
| This Document Relates To: ALL ACTIONS. | **DECLARATION OF KENNETH TRAUB IN SUPPORT OF SPECIAL LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS OF MRV COMMUNICATIONS, INC.'S RESPONSE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT** |
| | Hearing Date: April 8, 2013<br>Time: 9:30AM<br>Courtroom: 740<br>Judge: Hon. Gary A. Feess |

I, Kenneth Traub hereby declare that:

1. I am Chairman of the Board of Directors of MRV Communications, Inc. ("MRV"). I currently serve on the Audit, Compensation and Nomination & Governance Committees of MRV. I am also a member of the Special Litigation Committee that has investigated the facts surrounding this case. I have personal knowledge of the facts set forth in this declaration, except where I indicate otherwise, and could and would testify competently thereto if called upon to do so.

2. I received a Bachelor's degree from Emory College and an MBA from Harvard Business School.

3. From 1994 to 1998, I was Executive Vice President and CFO of Voxware, Inc.

4. From 1999 to 2008, I was President, and from 2000 to 2008 I was CEO, of American Bank Note Holographics Inc. ("ABNH"). At ABNH, prior management issued financial statements that required restatement which resulted in litigation, SEC investigation and other challenges. I led ABNH through settlement of the litigation and SEC investigation, and managed a turnaround that included improving corporate governance and control systems, restoring integrity, rebuilding the business and selling the company to JDS Uniphase Corp.

5. In 2008, I was Vice President of JDS Uniphase Corp.

6. From 2009 to Present, I have been serving as President and Chief Executive Officer of Ethos Management LLC.

7. I presently serve on the board of directors of five public companies in addition to MRV: iPass, Inc., Athersys, Inc., DSP Group, Inc., TIX Incorporated and Vitesse, Inc. I also serve as Chairman of the board of directors of privately held Omnego, Inc. I previously served on the board of directors of Phoenix Technologies, Inc. and MIPS Technologies, Inc., both of which have been sold.

8. I joined the Board of Directors of MRV ("Board of Directors") in

October 2011.

9. I have never been a defendant in the above-captioned litigation.

10. Apart from my service as a director of MRV, I have not had business or social interactions with the corporation or the individual defendants.

11. I am informed and believe that, on June 1, 2008, the MRV Board of Directors appointed a Special Committee (the "First Special Committee") to conduct an investigation into the Company's historical stock option practices and certain accounting issues. On June 5, 2008, MRV issued a press release announcing the formation of the First Special Committee and stating that the Company had recently discovered information concerning the Company's stock option accounting practices from 2002 through the first quarter of 2004. In the press release, the Company stated that it expected to restate financial statements for the years 2002 through 2008.

12. I am informed and believe that, the First Special Committee retained the law firm Proskauer Rose LLP and the forensic accounting firm PricewaterhouseCoopers LLC to assist in its investigation into the Company's historical stock option practices.

13. I am informed and believe that, for the remainder of 2008, the First Special Committee conducted an investigation that included witness interviews, review of documents, and forensic analysis. I understand that the investigation focused on the period January 1, 1998 through May 31, 2008.

14. I am informed and believe that, on February 2, 2009, the Company issued a press release announcing the principal findings of the First Special Committee investigation including that many pre-2004 option grant dates and grant prices were retrospectively selected in a manner that was inconsistent with the Company's option plans.

15. I am informed and believe that, the First Special Committee also

determined that the Company implemented improved stock option controls beginning in March 2004, and the First Special Committee made a number of corporate governance recommendations, which were adopted. These included hiring new independent directors, hiring a general counsel and an internal auditor, and engaging an outside stock plan administrator to oversee the option and other share-based compensation granting process.

16. I am informed and believe that, on October 8, 2009, the Company announced that, with the assistance of outside advisors, it had completed its review of its option granting history for the period February 23, 1994 to May 1, 2008 and filed restated financial statements for the prior periods on Form 10K with the Securities and Exchange Commission. This review resulted in an additional non-cash, pre-tax share-based charge, net of forfeitures, of $74.4 million for the years 1994 through 2007.

17. On November 8, 2011, the Board of Directors formed the present Special Litigation Committee (“SLC”) to review the pending derivative litigation and make recommendations with regard to how the Company should respond to that litigation.

18. At the time the SLC was formed, only one of the named defendants was a member of the Board of Directors. That defendant was no longer a member of the Board effective October 11, 2012.

19. The MRV Board of Directors delegated to the SLC the full and exclusive authority to investigate, review, analyze and evaluate the facts and circumstances surrounding the stockholder derivative litigations, and any facts and circumstances relating to the Company’s historical stock option granting practices. The MRV Board of Directors delegated to the SLC the full and exclusive authority to recommend and take any action on behalf of the Company, consistent with Delaware law and the Company’s governing documents, that is or would be in the

best interests of the Company and its stockholders. This authority included, among other things, the power to negotiate and engage in discussions, negotiations, suits, settlements and other actions with all parties to the federal and state stockholder derivative litigations, party-appointed mediators, and the Company's insurance carriers that the SLC in its business judgment determined to be in best interests of the Company and its stockholders.

20. Charles Gillman, Joan Herman, and Robert Pons were the original members of the SLC. Subsequently, Ms. Herman left the Board and on May 8, 2012, the MRV Board selected Glenn Tongue and I to serve on the SLC alongside Messrs. Gillman and Pons. On September 7, 2012, the MRV Board determined that the SLC would consist solely of Mr. Pons and me.

21. We (the SLC) retained the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") and began our investigation into the facts and circumstances of the Company's stock option program in or about May 2012.

22. We investigated the strength of the legal claims asserted against the individual defendants and potential legal obstacles to recovery. We conducted a detailed legal and factual analysis of each claim asserted against each named defendant. The SLC met frequently by teleconference with WilmerHale to discuss the investigation's findings, its status and to address legal and factual issues.

23. The factual investigation we conducted drew on the work that had been undertaken and generated by the First Special Committee investigation and the subsequent forensic analysis relied on for the Company's restatement of its financials. We focused our fact investigation on aggregating and analyzing the results of the prior inquiries and conducting new inquiries into issues that required further exploration.

24. We directed WilmerHale to confer with firms retained by the Company and the First Special Committee; and collect and analyze information,

documents and work product from the First Special Committee investigative team, the Company, and the Company's outside counsel. These materials included the following: all Company Board minutes from 2008 to the present; relevant Company press releases and SEC filings; key historical documents, including email correspondence, memoranda, option grant material, and stock option plans identified in the First Special Committee investigation; work product memoranda of witness interviews conducted by the First Special Committee; work product memoranda prepared by the Company and its advisors to guide the Company's restatement; option grant and exercise data prepared by PricewaterhouseCoopers LLC based on work performed in connection with the First Special Committee investigation and the restatement; and option grant and exercise data maintained in the Company's stock option database.

25. We also reviewed corporate governance reforms that had occurred at the Company and explored additional corporate governance reforms, including changes to stock option granting practices and personnel, that could further improve the governance framework the Company developed in recent years.

26. As a result of our investigation, we determined that the interests of the Company and its stockholders would be best served by resolving this stockholder derivative litigation on the terms reflected in the Stipulation of Settlement, rather than allowing the litigation to continue indefinitely with an uncertain outcome. The SLC based this conclusion on its analysis of the factual evidence and law that would support the claims and defenses asserted in the derivative lawsuits.

27. We engaged in extensive negotiations with all parties to the federal and state stockholder derivative litigations, party-appointed mediators and MRV's insurance carriers. The Stipulation of Settlement before this Court is a direct result of these negotiations. The terms of the Stipulation of Settlement include important corporate governance reforms which we believe are in the best interests of the

Company.

28. The Company has implemented and agreed to implement corporate governance changes in response to the proposals of plaintiffs' counsel. By way of illustration, MRV's current Board of Directors and executive management team consist entirely of directors and executives that had no connection to the Company during the time period covered by the pending litigation. We concluded that additional corporate governance measures would provide additional benefits to MRV and its stockholders.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 20, 2013 in Princeton, NJ.

By: [signature]
Kenneth Traub